UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ILLINOIS CENTRAL RAILROAD
COMPANY

CIVIL ACTION

VERSUS

NO: 04-432
C/W 04-2582

JP TRUCKING, ETC., ET AL

SECTION: "J"(5)

## ORDER AND REASONS

Before the Court is the **Motion for Summary Judgment** filed by defendant County Services.  Rec. Doc. 117.  St. Paul Fire and Marine Insurance Company ("St. Paul") and Illinois Central Railroad ("ICRR") oppose the motion.  Oral argument on the motion was held on August 17, 2005, after which the motion was taken under advisement.  For the reasons which follow, the Court finds the motion should be GRANTED.

## FACTUAL & PROCEDURAL BACKGROUND

Billy Estes, the owner of the Robert Wood Yard, hired Jimmy Price to haul wood from the Robert Wood Yard to the Southern Wood Yard.  Price in turn hired Walter Lewis to actually drive the

tractor trailer of pulp wood.  Price owned the tractor; Wallace Van Meter owned the trailer.

The Southern Wood Yard was owned by Remington Oil and Gas and leased by Southern Wood, and served as a delivery point for wood sold by Estes to Georgia Pacific.  However, because Georgia Pacific ("GP") requires an authorization number for sales, which Estes did not possess, Estes, by arrangement with County Services (or its alter ego, Triangle Timber) used County Services' GP authorization number to transact sales to GP.

On the date of the accident upon which the consolidated suits are based, Lewis was exiting the Southern Wood Yard to return to the Robert Wood Yard when the truck he was driving collided with a train operated by ICRR and comprised in part of cars owned by First Union Rail Corp.  In consequence of the damages sustained by First Union, its insurer and subrogee, St. Paul, has made payments for the loss.

As a result, ICRR sued JP Trucking/Jimmy Price, Walter Lewis, County Services, Inc., Southern Wood, Inc., and Remington Energy.[1]  ICRR's complaint alleges that at the time of the collision, Lewis was in the course and scope of his employment with Jimmy Price and/or County Services.  Cmplt. ¶ VIII.  It

---

[1]ICRR has since dismissed its claims against Remington.

further alleges that Price and County Services have respondeat superior liability for Lewis' negligence.  Id.  ¶ XI.  It alleges liability on the part of Remington and Southern Wood for the existence of a sight obstruction at the crossing.

Southern Wood counterclaimed that ICRR (a/k/a CN) was liable for the damages due to its negligent operation of the train, and filed a cross-claim against Price, Lewis, and County Services making essentially the same allegations as those in ICRR's main demand.

ICRR filed a first amended complaint adding as defendants Billy Estes and Triangle Timber (alleged to be an alter ego of County Services), alleging that they too were employers of Lewis and bore respondeat superior liability for his negligence. Additionally, it alleged independent negligence of the putative employers of Lewis in hiring him, failure to train and supervise him, and failure to discover his impairment (marijuana intoxication) on the date of the accident.

In the consolidated case, St. Paul Fire & Marine Ins. Co. filed suit against Jimmy Price, Walter Lewis, County Services, Southern Wood, Remington, Williams Estes and Triangle Timber, as subrogee of First Union Rail Corp., also alleging respondeat superior liability for the negligence of Walter Lewis as to Price, County Services, Estes and Triangle.  It alleges liability

3

against Southern and Remington (since dismissed) for the existence of a sight obstruction at the crossing.

<u>**ARGUMENTS OF THE PARTIES**</u>

In its motion for summary judgment, County Services argues that it is entitled to dismissal because it bears no respondeat superior liability for Lewis' negligence, since it was not his employer or borrowing employer.  County Services further argues that it did not have a contractual agreement with Jimmy Price, Billy Estes, or Triangle Timber, nor did it own the pulp wood being hauled, and its sole relationship to the facts of this case is that it permitted Estes to use its GP authorization number to sell wood to GP and deliver it to Southern Wood Yard.  In sum, County Services argues that under the allegations of the complaint, the only basis for liability to attach to it is if Lewis is either its employee or deemed to be its borrowed employee, and that he was neither.

St. Paul opposes the motion arguing that Lewis was a borrowed employee, because the borrowed employee determination turns on the issue of control, and County Services "controlled the opportunity" for Estes to have Price and Lewis haul logs, by permitting Estes to use its GP authorization number.  St. Paul also argues that Estes was an apparent or implied agent of County Services.

ICRR opposes the motion arguing that Walter Lewis was the agent of principal County Services, and that there are genuine issues of material fact as to whether Lewis was an employee of County Services.  With respect to the employment (respondeat superior) issue, ICRR does not dwell on the "borrowed employee" inquiry, but instead claims the dispositive issue is whether Lewis was an employee or independent contractor of County Services, suggesting that fact issues preclude resolution of this question.

**DISCUSSION**

The liability of County Services is premised on the theory of respondeat superior – that County Services is liable for Walter Lewis' negligence due to either an employer/employee relationship, or a principal/agent relationship.  Accordingly, a threshold question is whether Lewis may fairly be considered the borrowed employee of County Services.  It appears undisputed that Lewis was the direct employee of – or at least hired by – Jimmy Price; thus, the issue becomes whether he could have been considered the borrowed employee of County Services.  Two methods have been advanced to support such a finding.  First, St. Paul argues that under the "borrowed employee" analysis set forth in Capps v. N.L. Baroid-NL Industries, Inc., 784 F.2d 615 (5th Cir. 1986), Lewis may be considered the borrowed employee of County

Services.  Second, ICRR suggests that resolution of the liability issue requires an analysis of whether Lewis was an employee as opposed to an independent contractor.

***Borrowed Employee***

The Fifth Circuit has adopted a nine-pronged test to determine whether an employee of one entity is a borrowed employee of another:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
>
> (2) Whose work is being performed?
>
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
>
> (4) Did the employee acquiesce in the new work situation?
>
> (5) Did the original employer terminate his relationship with the employee?
>
> (6) Who furnished tools and place for performance?
>
> (7) Was the new employment over a considerable length of time?
>
> (8) Who had the right to discharge the employee?
>
> (9) Who had the obligation to pay the employee?

Capps, 784 F.2d at 616 -617 (5th Cir. 1986)(citations omitted). "While the courts do not use a fixed test and do not decide the issue based on one factor, the courts place the most emphasis on

the first factor, control over the employee." Id. (citations
omitted).  "The district court decides the borrowed employee
issue as a matter of law, Gaudet v. Exxon Corp., 562 F.2d 351,
357-58 (5th Cir. 1977), and, if sufficient basic factual
ingredients are undisputed, the court may grant summary judgment.
Capps, 784 F.2d at 617 (other citations omitted).

A consideration of the nine factors listed above suggests
that Lewis was not a borrowed employee of County Services.  Most
tellingly, with respect to the first factor, Lewis' work was not
controlled by County Services.  To the contrary, Lewis was hired
by Price, the owner of the truck, and directed where to deliver
the pulp wood by Billy Estes, the owner of the Robert Wood Yard.
Thus, Price and Estes controlled Lewis' work.

As for the second factor, the work that was being performed
was for the owner of the pulpwood.  Notwithstanding the fact that
County Services received a $1 per ton fee for use of its GP
number, Estes ultimately received payment for all of the wood
(less the $1 per ton fee), indicating that Estes owned the wood.
While it is true that Jimmy Price's deposition reflects that he
believed Estes was an employee of County Services, and that the
wood was for their account, while Price's subjective belief may
have relevance to whether County Services cloaked Estes with
apparent authority, it has no bearing on the objective answer to

7

the question of who owned the pulp wood.  Because the record
reflects that payment for the wood went to Estes, the Court can
only conclude that he, not County Services, owned the pulpwood.
The work being performed then was for Estes, not County Services,
and this factor too militates against a finding that County
Services was Lewis' borrowing employer.

With respect to the question whether there an agreement
between Jimmy Price (the original employer) and County Services
(the putative borrowing employer), it appears that County
Services had no agreement with Jimmy Price (the person who hired
Lewis) or Billy Estes (the person who owned the pulp wood),
regarding Walter Lewis.  Indeed, County Services claims not to
have known Lewis or that he was delivering anything for Estes.

The fourth prong of the Capps test addresses whether the
employee acquiesced in the new work situation.  At the time of
the accident, Lewis had been working for Price for only three
days, doing runs to the Southern Wood Yard.  The only change in
his work situation was that the date of the accident was the
first time Lewis did a run to the Southern Wood Yard by himself.
Lewis Depo., 94-96.  However, Lewis' duties did not materially
change from what he was originally hired by Price to do.  Thus,
it appears there is no "new" work situation of the nature
contemplated by this question (i.e., one where his regular

8

employer sent him to a new site).  The fifth prong of the <u>Capps</u> inquiry – whether the original employer terminated his relationship with the employee – is likewise inapplicable.  While Price sent Lewis on his first solo run on the date of the accident, there was no change to the very recently established employment relationship.

As for the question of who furnished tools and the place for performance, Price owned the tractor, Wallace Van Meter owned the trailer, and Lewis delivered pulp from Estes' Robert Wood Yard. County Services had no role with respect to tools or the place of performance.

Because there was no "new" employment as contemplated by the <u>Capps</u> inquiry, the seventh prong – whether there was new employment over a considerable length of time – does not apply to this case.  As for the eighth consideration, Price had hired Lewis and presumably had the right to fire him.  County Services, who did not even know Lewis or that he was delivering for Estes, was not entitled to fire him.

With respect to the final factor – who had the obligation to pay the employee -- Lewis was paid in cash by Price.  Thus this factor, too, provides no support for the contention that Lewis was the borrowed servant of County Services.

In its opposition, St. Paul has attempted to show that

County Services did have an obligation to pay Billy Estes for the
work being done.  By arrangement, Estes paid County Services $1
per ton for wood that he sold under County Services'
authorization number.  County Services took the amount due from
the remittance from GP, and passed the rest to Estes, the timber
owner.  St. Paul argues that because County Services knew that
from that balance payments would be taken for Lewis, Price, and
Estes, County Services was paying Lewis, Price, and Estes.  But
County Services was not "paying" any of these individuals – the
opposite was true:  County Services was paid by Estes, in the
form of the $1 per ton fee taken off the total remittance from
GP, and the balance, which County Services passed on, was Estes'
own money, passed through County Services solely to satisfy the
GP authorization number requirement.  There is simply no
reasonable basis for concluding that County Services paid Walter
Lewis' salary.

Apparently in recognition of the fact that the established
Capps factors do not suggest that County Services controlled
Lewis' work so that he can be considered its borrowed employee,
St. Paul has also made the novel argument that Lewis was the
borrowed employee of County Services because County Services
"controlled the opportunity" for Billy Estes to have Jimmy Price
and Walter Lewis haul logs.  By this, St. Paul is referring to

10

the fact that for Estes to sell logs to GP, he had to "borrow"
County Services' authorization number, and thus, that County
Services controlled Estes-Price-Lewis because County Services
could decide whether or not to let Estes use the number, and thus
whether or not there were any logs for Price/Lewis to haul.

The problem with this argument is that the Fifth Circuit in
Capps promulgated an extensive, detailed test to determine if an
employee is a borrowed employee, and nowhere within that test is
there mention of who "controlled the opportunity" for the work to
be performed.  Rather, Capps is concerned with who exercised
control over the time, place, and manner in which the employee
worked, and in the instant case, County Services exercised no
control over the specifics of Lewis' job performance.

Moreover, the Court notes that considering who "controlled
the opportunity" for work to be performed as a prong of the test
of whether an employee is a borrowed employee leads to absurd
results:  in reality, the end purchasers of any product or
service create and thus "control the opportunity" for work to be
done or services to be performed, and following the logic of St.
Paul, these end consumers or customers would be deemed borrowing
employers!

Accordingly, while there may be some factual dispute about
who Lewis and Price *believed* Estes was working for, the

undisputed facts material to resolving the inquiries encompassed by the Capps test demonstrate that there is no basis for a finding that Lewis was the borrowed employee of County Services.

**_Independent Contractor Rule Exception_**

In its opposition to County Services' motion, ICRR also claims that genuine fact issues exist as to whether Lewis is an employee of County Services.  However, ICRR rejects County Services' attempt to frame the issue in terms of the Capps/borrowed employee test.  Instead, ICRR suggests that the Court should be analyzing whether Lewis should be considered a County Services employee, rather than an independent contractor, under one of the limited exceptions to the general rule that a principal is not liable for the offenses committed by a independent contractor while performing its contractual duties, namely the exception that imposes liability when "the principal reserves the right to supervise or control the work of the independent contractor."  Ledent v. Guaranty Nat. Ins. Co., 723 So.2d 531, 537 (La. App. 2nd Cir. 1998)(citations omitted).

In Louisiana, "[t]he distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis." Fontenot v. J.K. Richard Trucking, 696 So.2d 176, 180 (La. App. 3rd Cir. 1997).  A principal and independent contractor relationship exists when the

following conditions are met:

> (1) there is a valid contract between the parties;
>
> (2) the work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;
>
> (3) the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to control and direction of principal, except as to the result of the services to be rendered;
>
> (4) there is a specific price for the overall undertaking; and
>
> (5) a specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.

Green v. Bobby A. Freeman Estate, 759 So.2d 201, 203-204 (La. App. 3 Cir., 2000); Fontenot, 696 So. 2d at 180; Ledent, 723 So.2d 531.

However, "[t]he most important inquiry is whether the principal retained the right to control the work.  In applying this test, it is not the supervision and control which is actually exercised which is significant; the important question is whether, from the nature of the relationship, the right to do so exists."  Ledent, 723 So.2d at 538.

Relying on Green, ICRR claims that there are numerous factual issues as to whether County Services controlled the work of Estes, who in turn controlled the work of Price and Lewis. ICRR contends that several features that caused the Green court

to reverse a trial court finding of independent contractor status
are present in this case – namely, there is no written contract
between the parties spelling out an independent contractor
relationship; there was no specific time or duration agreed upon
for performance of the work; County Services (according to ICRR)
controlled the work, though it did not tell the trucker what
route to take in order to deliver the logs, because it controlled
Estes and Estes controlled Price and Lewis); and the trucker was
paid by weight rather than by the day.  ICRR also notes that the
relationships were subject to at-will termination without
liability for breach.

The problem with ICRR's approach is that no one has raised
an independent contractor defense in this case.  County Services
is not arguing "Lewis is not our employee, he's an independent
contractor"; rather, County Services' argument is that they have
no relationship to Lewis and in fact had never heard of him prior
to this litigation.  And – as was the case in considering St.
Paul's borrowed employee argument – ICRR cannot get around the
dispositive question of control.  To find that Lewis was the
employee of any entity, it must be shown that the entity reserved
the right to supervise or control his work.  In addition to the
facts set forth above in connection with the borrowed servant
discussion, the Court reiterates:  County Services did not own

14

the pulp wood, the yard, or the truck driven by Lewis.  Given this, the Court cannot conclude that County Services retained the right to supervise or control his work.

*Agency*

St. Paul and ICRR also suggest that because County Services' name appeared with its permission on the load ticket for the loads in question, third parties were justified in assuming that Estes and Price and Lewis were hauling the load for County Services, and thus County Services, as principal, may be held liable for the acts of Lewis, its agent.  Fleshing out this line of argument, ICRR has made a sub-agency argument suggesting that liability may attach to County Services because Estes was the agent of County Services and Lewis, as an agent of Estes, was the sub-agent of County Services, relying on <u>Dockens v. LaCaze</u>, 78 F. Supp. 515 (W.D. La. 1948), in which the court found Texas Oil Company liable for the driving of a sub-agent.

Under Louisiana law, if certain required conditions are met, "[t]he principal will be bound for the agent's actions if the principal has given the innocent third party a reasonable belief the agent had authority to act for the principal." <u>Boulos v. Morrison</u>, 503 So.2d 1, 3 (La. 1987).  "[T]he party seeking to bind the principal has the burden of establishing the existence of the agency relationship." <u>Ehlinger & Associates v. Louisiana</u>

15

Architects Ass'n,  989 F. Supp. 775, 787 (E.D. La., 1998).
However, as ICRR acknowledges in its opposition memorandum,
"[l]iability for the *tortious or negligent conduct* of another
does not flow because of a principal-agent relationship.  The
principal is liable only when the relationship includes the
principal's right to control physical details as to the manner of
the actor/agent's performance, a characteristic of a master and
servant relationship." Urbeso v. Bryan, 583 So.2d 114, 117-18
(La. App. 4th Cir. 1991), citing Rowell v. Carter Mobile Homes,
Inc., 500 So.2d 748 (La. 1987)(emphasis added).[2]  Thus, once

---

[2]In a case not cited by any of the parties, the Supreme
Court limited the Rowell holding in Independent Fire Ins. Co. v.
Able Moving & Storage Co., Inc., 650 So. 2d 750, 752 (La. 1995),
stating that it was inapplicable to cases in which third persons
act to their detriment on the basis of an agent's apparent
authority.  Independent Fire does not control this case for two
reasons.  First, apparent authority is not in issue here because
"apparent agency exists if the principal has the right to control
the conduct of the agent and the agent has the authority to bind
the principal," Urbeso, 583 So.2d at 117, and, as set forth at
length in this order, County Services did not have the right to
control Walter Lewis' conduct.  Moreover, there is no suggestion
that Walter Lewis had the authority to bind County Services.

Second, there is no detrimental reliance in the instant case
and thus it is distinguishable on its facts from Independent
Fire.  In that case, the customer contracted with defendant Able
Moving and Storage specifically in reliance on representations,
authorized by Bekins, that suggested she was dealing with Bekins,
a national moving company, and that Bekins was guaranteeing
workmanlike performance.  In the instant case, there is no
indication that ICRR or St. Paul relied on any representation of
County Services that Walter Lewis was a responsible driver.

16

again, the dispositive issue for attaching any liability to
County Services boils down to the question of control.

ICRR contends that because County Services determined how
the load slips would be completed, how its authorization number
would be used by the truckers, and the amounts paid to and
received from Estes, it exercised the requisite control.
However, County Services' control of the minutiae related to the
loan of its authorization number does not appear to be
"characteristic of the relation of master and servant" as
contemplated by the case law concerning agency.  Case law
addressing the relationship necessary for a principal to be
liable for the tortious acts of an agent is plain:  "it is the
[principal's] right of control and supervision, selection and
engagement, payment of wages, and the power of dismissal" that
must be present for liability to attach for the tortious acts of
an agent.  Stephens v. Bail Enforcement of Louisiana, 690 So.2d
124, 129 (La. App. 1st Cir. 1997).  The undisputed facts before
the Court reflect that County Services exercised none of these
rights with respect to Walter Lewis.  Accordingly, County
Services is not liable for the torts of Walter Lewis under a
principal-agent theory.

In sum, the record reflects, as County Services contends,
that its sole relationship to the facts of this case is that it

17

permitted Billy Estes to use its Georgia Pacific authorization number.  There is no basis for a finding of respondeat superior liability on the part of County Services for the torts of Walter Lewis, and therefore,

**IT IS ORDERED** that the **Motion for Summary Judgment** filed by defendant County Services, Rec. Doc. 117, should be and is hereby **GRANTED**, and the claims against it are hereby **DISMISSED with prejudice**.

New Orleans, Louisiana, this __9th__ day of February, 2006.


CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

18